THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

| | | |
|---|---|---|
| **JODIE LOVE,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | **CASE NO.: 2:16-CV-160** |
| | ) | |
| **VIRGINIA PORT AUTHORITY,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant** | ) | |

## AMENDED COMPLAINT

Plaintiff, Jodie Love, by counsel, hereby moves for judgment against Defendant, Virginia Port Authority, for violations of the Family Medical Leave Act (hereinafter "FMLA") 29 U.S.C. § 2601, *et seq.*, violations of the Americans with Disabilities Act of 1990 (hereinafter "ADA"), 42 U.S.C. §12101, *et seq.*, ("ADA"), and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §701 *et seq.*

## PARTIES

1. Plaintiff, Jodie Love, is and was at all times relevant to this litigation a resident of Chesapeake, Virginia.

2. Virginia Port Authority, Plaintiff's former employer and Defendant in this case, is an autonomous agency of the Commonwealth of Virginia organized under the laws of the Commonwealth of Virginia with its principal place of business and headquarters located at 600 World Trade Center, Norfolk, Virginia. At all times relevant to this litigation, Defendant was engaged in commerce as well as activity affecting commerce, and employed at least fifty employees for each working day during each of 20 or more calendar weeks.

## VENUE

3. Venue is proper in this Court pursuant to 28 U.S.C. §1391 as Defendant's headquarters is located in Norfolk, Virginia, and the claims asserted in this action arose within this district.

## JURISDICTION

4. This Court has subject matter jurisdiction over the federal claims asserted pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617.

5. This Court has personal jurisdiction over this action because Defendant is headquartered within the Commonwealth of Virginia and the causes of action arise out of transacting business in Virginia.

## FACTS COMMON TO ALL COUNTS

6. Defendant is responsible for maintaining and developing the marine terminals owned by the Commonwealth of Virginia, as well as fostering and stimulating economic growth in Virginia through global import/export freight.

7. Defendant is also responsible for the oversight of the operation of the state owned marine terminals through its wholly owned private operating company, Virginia International Terminals (hereinafter "VIT").

8. Defendant hired Plaintiff in 2006 as a Senior Administrative Assistant.

9. Defendant promoted Plaintiff to Executive Secretary on June 10, 2007.

10. Defendant further promoted Plaintiff to Community Relations Coordinator on September 9, 2009.

11. As Community Relations Coordinator, Plaintiff reported directly to Defendant's Senior Deputy Executive Director, a highly ranked official of Defendant.

12. In her role as Community Relations Coordinator, Plaintiff frequently attended local community and city meetings to present the economic benefits of Defendant to the Commonwealth and other information publicly on behalf of Defendant. More specifically, Plaintiff delivered presentations on behalf of Defendant to public groups including municipal counsel, schools, colleges, and professional groups.

13. Plaintiff also represented Defendant to various legislative groups and lobbied on its behalf.

14. Defendant directed Plaintiff to serve upon numerous community boards on its behalf.

15. Plaintiff also hosted tours of Defendant's facilities on a weekly basis for all levels of visitors, including executives and legislators.

16. Plaintiff frequently participated in agency head meetings and traveled to Richmond regularly during the General Assembly sessions to advance the legislative initiatives of Defendant.

17. In sum, as Community Relations Coordinator, Plaintiff had a number of varied responsibilities related to interacting with various segments and groups of the public.

18. Plaintiff's job performance was exceptional as evidenced by her outstanding performance reviews, regular pay increases, promotions and increases in responsibility.

19. In fact shortly before the incidents occurred which gave rise to this litigation, Plaintiff was promised a promotion by Cathie France, Chief Public Affairs Officer, for consistently performing well and receiving excellent reviews, both internally from colleagues and supervisors as well as externally from the community.

20. In October 2013, Plaintiff learned that she was pregnant after many years of infertility and pregnancy loss.

21. Upon learning this, Plaintiff immediately informed her interim supervisor, Heather Wood, as she knew that she would potentially need to be absent from work due to her condition.

22. On January 16, 2014, Plaintiff informed Ms. France that she was experiencing complications with the pregnancy which would require her to be absent.

23. On January 17, 2014, Plaintiff's unborn son passed away. Plaintiff took three days of personal leave to recover and returned to work on January 23, 2014, where she attended an awards luncheon at the Founders Inn as part of her duties.

24. On February 10, 2014, Plaintiff suffered a severe medical complication, namely ruptured ovarian cysts due to the lost pregnancy which required emergency treatment.

25. Kristen Edwards, Defendant's Human Resources Manager, directed Plaintiff to follow up with her primary care physician and provide documentation of her medical condition while she was out on leave.

26. Dr. Hal Barnes authorized Plaintiff to return to work on February 24, 2014.

27. To cover her absences, Plaintiff used a two week portion of a large quantity of personal leave accrued over years of consistent attendance.

28. Upon returning, Plaintiff turned in her doctor's note to human resources on February 24, 2014 and Ms. Edwards asked if Plaintiff would like to designate that time as FMLA leave time.

29. Plaintiff declined to designate that time as FMLA leave time as she previously had accrued sufficient personal leave to cover the absence. As such, there were no forms

completed and this leave was not certified nor counted toward her annual FMLA 12 week allowance.

30. In April 2014, Plaintiff suffered further medical complications from the loss of the pregnancy, including further ruptured ovarian cysts and major postpartum depression disorder.

31. At this time, Plaintiff exercised her right to request time off under the FMLA to attend to her own serious medical condition.

32. Plaintiff's request for FMLA was approved beginning April 21, 2014.

33. Plaintiff applied for and received disability benefits in or around this time period.

34. Plaintiff notified Defendant of her disability (major postpartum depression) during this period of time.

35. Even while out on disability, Plaintiff completed tasks at the request of Ms. France including the drafting of a Corporate Giving Policy and memos regarding participation in the Old Dominion University Maritime Institute.

36. On May 21, 2014, Plaintiff received a notice from Defendant that her short term disability had been approved and her designated FMLA would end on July 11, 2014.

37. Ms. Edwards reiterated to Plaintiff that her FMLA time would run through July 11, 2014 and Plaintiff would be expected to report to work on July 14, 2014.

38. On June 26, 2014, Plaintiff met with Mr. Jim Bibbs, Chief of Human Resources regarding the expiration of her FMLA leave and her return to work.

39. Mr. Bibbs assured her that her job was secure and only if necessary would find a temporary work assignment upon her return to work on July 14, 2014.

40. Mr. Bibbs asked Plaintiff to follow-up with him the next week by phone.

41. As requested, Plaintiff called Mr. Bibbs on July 3, 2014. Mr. Bibbs did not answer the phone and Plaintiff could not leave a message in his voicemail because it was not accepting messages. Plaintiff immediately sent Mr. Bibbs an email but she did not receive a call back.

42. On July 8, 2014, she sent Mr. Bibbs another email and received no response.

43. On July 9, 2014, Ms. France and Elizabeth Saxby, Human Resources Director, called Plaintiff to discuss her return to work.

44. Ms. France informed Plaintiff she could return to work as an "administrative assistant" to the human resources and legal teams, or "sales coordinator" reporting to Tom Capozzi, Senior Managing Director of Marketing Services.

45. Plaintiff requested that she be returned to her previous position.

46. Ms. France and Ms. Saxby denied this request and simply stated that returning to that position was not an option. Ms. France indicated that she had concerns about Plaintiff's prior job performance but could not provide any subjective or objective fact which would substantiate her concern.

47. Therefore, Plaintiff was denied her right to return to her prior position based upon perception that she had a disability (major postpartum depression) even though she was still fully capable of performing her job.

48. Plaintiff stated that she had the right to be returned to her previous position or an equivalent position pursuant to the FMLA. Ms. France and Ms. Saxby described the sales coordinator position as equivalent to the position of Community Relations Coordinator.

49. Plaintiff returned to work on July 14, 2014, whereupon she was immediately thrown out of her prior office and ordered to move into a cubicle.

50. On July 15, 2014, Plaintiff saw a posting for a job with the exact same duties as her previous position.

51. Plaintiff immediately reported to Ms. Saxby that she wanted to apply for this job as the duties were exactly the same as the position she held prior to taking her FMLA leave. Ms. Saxby told her that the job was not an option for her and that she was not allowed to even apply for it.

52. The job was filled four days later by Sarah McCoy. It was later discovered that Ms. McCoy was recruited by Ms. France while Plaintiff was out on medical leave.

53. Plaintiff discovered a number of differences between Community Relations Coordinator and Inside Sales Coordinator that showed her new position was inferior to her previous position.

54. For example, Plaintiff no longer had a flexible schedule.

55. Also, Plaintiff had previously reported to top level executives and was told she would report to Mr. Capozzi; in her current position she was reporting to middle management.

56. Additionally, Plaintiff now found herself engaging in primarily administrative work, including but not limited to the maintenance of files, coordination of meetings, taking notes at meetings, processing paperwork, answering phones, and generally being treated as an administrative secretary. The sum of these parts made it appear as though Plaintiff was demoted.

57. Plaintiff informed Defendant that she was essentially demoted and in retaliation Defendant forced her to become a lower ranking Customer Service Representative in full view of her former colleagues.

58. Plaintiff informed Defendant that her new position was not equivalent to her old position and was in fact a demotion.

59. Furthermore, Plaintiff was directed to report to Cary Hagen, Vice President of Cargo Sales. It became apparent to Plaintiff that Mr. Hagen did not wish for her to contribute as he frequently excluded Plaintiff from emails, meetings, distributions, and group gatherings.

60. Mr. Hagen was non-responsive to Plaintiff when she requested direction or approval of work product.

61. Plaintiff requested of Mr. Hagen that due to her difficulty in getting him to approve her work that she be able to contact Mr. Capozzi as an alternative. Mr. Hagen forbade Plaintiff from discussing any matters with Mr. Capozzi without first getting Mr. Hagen's approval, regardless of the fact that he was rarely in the office or available to answer/approve work.

62. On August 29, 2014, Plaintiff received a scheduled performance review. Plaintiff had three supervisors during the review period, and only reported to Ms. Wood for two months of the review period, yet she was in charge of the review. The review criticized Plaintiff for her absences which were allowable under the FMLA.

63. Plaintiff told Ms. Wood that it was unfair to rate her poorly due to her use of leave time guaranteed to her by the FMLA. Ms. Wood agreed to remove the comments about Plaintiff's rating being lowered due to use of FMLA time.

64. Although Defendant removed the comments about her being rated poorly for her disability and utilization of FMLA, Defendant did not change the score of the review. Plaintiff submitted a request to Human Resources that her review be reconsidered.

65. Ms. Wood discussed the aforementioned conversation with Mr. Hagen.

66. After this discussion between Ms. Wood and Mr. Hagen, the Plaintiff began to experience severe harassment, bullying and retaliation.

67. On September 9, 2014, Plaintiff walked in on a conversation and overheard Mr. Hagen state to a colleague that the Plaintiff was "difficult to work with" and a "pain in the ass."

68. On September 22, 2014, Plaintiff asked Human Resources for a status update regarding her performance review.

69. On September 26, 2014, Mr. Hagen told Plaintiff he was docking her pay for a day she had requested and received his permission in advance to work from home. Mr. Hagen knew Plaintiff had produced work on this day and he had corresponded with her on several items during the course of the work day as well as throughout the weekend but still chose to dock her pay.

70. On September 26, 2014, Ms. Love informed her supervisor and human resources that she was experiencing harassment, bullying and retaliation.

71. On October 14, 2014, Mr. Hagen approached Plaintiff and told her she needed to complete her goals according to her job description. Plaintiff reminded Mr. Hagen that she did not have a completed job description and had questions about what her goals were (It was later determined that Mr. Hagen had failed to define what Plaintiff's goals actually were).

72. Mr. Hagen raised his voice and demeaned and berated the Plaintiff in front of her colleagues. Mr. Hagen then ordered the Plaintiff to his office where he continued to demean and belittle her. He told the Plaintiff that he wanted to meet with her again at 2:00 pm. The Plaintiff requested the presence of the department head or a human resources manager at the meeting, and Mr. Hagen refused.

73. The Plaintiff left Mr. Hagen's office in tears and immediately sent Mr. Capozzi an email requesting his presence at the meeting with Mr. Hagen. Mr. Capozzi attended and at this

meeting, the Plaintiff expressed that the constant bullying, harassment, and retaliation had escalated to a level that was unbearable and created a hostile work environment.

74. Even after this meeting, the retaliation continued. Mr. Hagen continued to harass Plaintiff and would question Plaintiff about her whereabouts during the day.

75. For example, when Plaintiff would return from the restroom, Mr. Hagen would comment "I know when you're taking a nature break" and "I'm watching you all the time, even when I'm not here." The Plaintiff found these statements very disturbing.

76. Plaintiff also found out that Mr. Hagen was spending time on the Internet researching her.

77. Due to the constant bullying, harassment, and hostile work environment, the Plaintiff suffered a relapse in her depressive disorder on or around October 15, 2014 and was forced to take an unpaid leave.

78. Plaintiff applied for and received short term disability during this period.

79. On October 17, 2014 Plaintiff filed a written complaint with human resources against her supervisor for harassment, bullying and retaliation.

80. On December 2, 2014, Defendant informed Plaintiff that at some future point in time she would be transferred to VIT, a wholly owned subsidiary of VPA which has lesser benefits and status.

81. On December 22, 2014, Plaintiff returned to work whereupon and was immediately called into a meeting where she was informed that her claims of harassment, bullying, and discrimination were without merit. Plaintiff requested to see the results of the investigation and this was denied. Plaintiff asked when she would be able to present the factual evidence to support her claims and was told she would not be allowed to do so.

82. Also, at the December 22, 2014 meeting, Ms. Saxby informed the Plaintiff that her performance evaluation would not be changed, even though Plaintiff never had the opportunity to present factual evidence which supported her claim.

83. In an effort to fully exhaust her remedies, Plaintiff made an appointment with Mr. John Reinhart, Executive Director and CEO.

84. On December 29, 2014, Plaintiff's paycheck was less than normal. Plaintiff made inquiries to Human Resources and the payroll department and neither could explain why her paycheck was deficient.

85. In January 2015, Plaintiff was transferred to VIT. Plaintiff was assured there would be no loss of benefits when she transferred and that the character of her employment would not change.

86. VIT's pension plan is a lesser plan than Plaintiff's pension plan with Virginia Port Authority.

87. On January 5, 2015, Plaintiff was presented with a performance improvement plan.

88. The plan referenced poor performance but did not provide specific examples. Plaintiff asked her supervisor to provide examples of the alleged poor performance and none were provided.

89. On January 8, 2015, Plaintiff met with Mr. Reinhart, Executive Director and CEO of VPA, as she had exhausted all other avenues for assistance. Plaintiff explained and expressed her love for her work as the Community Relations Coordinator. Plaintiff disclosed the reasons for utilizing FMLA and that she was prohibited from returning to her prior position or even

applying for that position. Plaintiff fully described the demotion, bullying and retaliation she was subjected to as a result of exercising her FMLA rights.

90. Mr. Reinhart scheduled another meeting with Plaintiff for January 20, 2015, where Mr. Bibbs would be present.

91. Before that meeting occurred, Plaintiff was reimbursed for the pay she had been previously docked.

92. On January 20, 2015, Plaintiff met with Mr. Reinhart and Mr. Jim Bibbs. Mr. Reinhart started the meeting by asking Plaintiff had she received the pay that she'd been docked. Plaintiff replied she had received it in her most recent paycheck. Mr. Bibbs told her that harassment, bullying and retaliation would not be tolerated and if she experienced it, to immediately report it to human resources. Plaintiff explained she had reported it previously and no action had been taken. Mr. Bibbs assured Plaintiff that corrective action would be taken if she continues to suffer harassment and retaliation. Mr. Reinhart and Mr. Bibbs told Plaintiff there was nothing they could do about an equivalent position at this time as her job had been filled, although they would ensure that she was placed in an equivalent position and "made whole" within the next six months.

93. On March 21, 2015, the Plaintiff successfully finished working through the performance improvement plan (PIP).

94. In September 2015, Plaintiff learned she was not a participant in the VIT pension plan, whereas she had been a participant in the VPA pension plan.

95. Furthermore, in her prior position, Plaintiff's 401K contributions were matched. She discovered in January of 2016 that VIT failed to make any matching contributions.

96. Plaintiff filed a charge with the EEOC.

97. Upon request, the EEOC issued a Right to Sue letter, a true copy of which is attached hereto as Exhibit 1.

98. The Plaintiff is no longer employed by Defendant due to the aforementioned harassment and bullying.

### COUNT I
### VIOLATIONS OF THE FAMILY MEDICAL LEAVE ACT

99. Plaintiff incorporates and re-alleges the allegations contained within Paragraphs 1-98 of this Complaint as fully set forth herein.

100. Plaintiff was an eligible employee as defined as and to receive protection under the Family and Medical Leave Act, 29 U.S.C. § 2611(2).

101. Defendant is an "employer" under the Family and Medical Leave Act, 29 U.S.C. § 2611(4).

102. Defendant was required by the Family and Medical Leave Act, 29 U.S.C. § 2614(a) to restore Plaintiff to her position of employment when she left or an equivalent position.

103. Defendant failed to comply with those requirements as it failed to restore Plaintiff to her previous position of employment or equivalent position as when she left, and in fact placed her in an inferior position.

104. Defendant was prohibited under the Family and Medical Leave Act, 29 U.S.C. §§ 2615(a), from interfering with or discriminating against Plaintiff's attempts to exercise her rights under the Act.

105. Defendant clearly violated this prohibition by among other activities not allowing Plaintiff to apply for the position that she held prior to her leave, as well as punishing her via demotion, harassment, and retaliation for attempting to exercise her rights under the FMLA.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor for damages against Defendant for no less that the amount of salary, employment benefits, and compensation which was illegally denied to Plaintiff, interest on the above referenced amount, liquidated damages, reinstatement, promotion, and reasonable attorney's fees plus costs incurred in prosecuting this action.

## COUNT II
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

106. Plaintiff incorporates and re-alleges the allegations contained within Paragraphs 1-105 of this Complaint as fully set forth herein.

107. Under the terms of the Americans with Disabilities Act, Defendant is a covered entity.

108. Plaintiff had a disability as defined under the Americans with Disabilities Act, namely an impairment (Major Postpartum Depressive Disorder) that substantially limited the major life activity of working.

108. Plaintiff was qualified to perform the essential functions of her previous employment position with or without reasonable accommodations.

109. Plaintiff was regarded as having a disability (Major Postpartum Depressive Disorder) by Defendant.

110. Plaintiff suffered an adverse employment action as Defendant did not allow her to even apply for her previous position due to her disability even though she was qualified to perform the essential functions of that job, and furthermore bullied and harassed her based upon her requests to perform that job.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor for damages against Defendant for no less than back pay including wages and fringe benefits, front pay,

reinstatement, promotion, compensatory damages, punitive damages, pre-judgment interest, reasonable attorney's fees, and costs incurred in prosecuting this action.

## COUNT III
## VIOLATION OF THE REHABILITATION ACT OF 1973

111.  Ms. Love incorporates and re-alleges the allegations contained within paragraphs 1-110 of this Complaint as fully set forth herein.

111.  Plaintiff is a disabled/handicapped individual as defined in 29 U.S.C. 705.

112.  Section 504 of the Rehabilitation Act of 1973 prohibits discrimination on the basis of disability by employers which receive federal funding.

113.  Defendant discriminated against Plaintiff by not even allowing her to apply for her previous position due to her disability even though she was qualified to perform the essential functions of that job.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor for damages against Defendant for no less than back pay including wages and fringe benefits, front pay, reinstatement, promotion, compensatory damages, punitive damages, pre-judgment interest, reasonable attorney's fees, and costs incurred in prosecuting this action.

Respectfully Submitted,

_____/s/_____
Gregory William Klein, Esquire

Gregory William Klein, Esquire
Virginia State Bar No.: 73110
Taylor & Walker, P.C.
555 Main Street, Suite 1300
Norfolk, VA 23510
Voice: (757) 625-7300
Fax: (757) 625-1504
gklein@taylorwalkerlaw.com
Counsel for Plaintiff Jodie Love

CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of January, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send electronic notification of such filing (NEF) to the following counsel of record:

Jimmy Frank Robinson, Jr., Esquire
Ogletree Deakins Nash Smoak & Stewart PC
901 East Byrd Street, Suite 1300
Richmond, VA 23219
Phone: 804-843-1808
Fax: 804-843-1809
Jimmy.robinson@ogletreedeakins.com

James Clay Rollins, Esquire
Ogletree Deakins Nash Smoak & Stewart PC
901 East Byrd Street, Suite 1300
Richmond, VA 23219
Phone: 804-441-6149
Fax: 804-843-1809
Clay.rollins@ogletreedeakins.com


_____/s/_____
Gregory William Klein, Esquire
Virginia State Bar No.: 73110
TAYLOR & WALKER, P.C.
555 Main Street, Suite 1300
Norfolk, VA 23510
Voice: (757) 625-7300
Fax: (757) 625-1504
gklein@taylorwalkerlaw.com